IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| STACY FONSECA, | ) | |
| | ) | |
| Plaintiff, | ) | CV-04-1117-ST |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| SECOR INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

STEWART, Magistrate Judge:

**INTRODUCTION**

Plaintiff, Stacy Fonseca ("Fonseca"), filed this action against her former employer, Secor International, Inc. ("Secor"), on August 12, 2004. Fonseca alleges two claims against Secor: (1) violation of Title VII of the Civil Rights Act of 1991 (42 USC § 2000e) and the parallel state statute prohibiting gender discrimination (ORS Chapter 659A) based on both a hostile work environment and on retaliation (First Claim); and (2) wrongful termination (Second Claim).

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). Secor has now filed a Motion for

1 - OPINION AND ORDER

Summary Judgment (docket #28) against both of Fonseca's claims. This court has original jurisdiction over the federal statutory claims under 28 USC § 1331 and supplemental jurisdiction over the state law claims under 28 USC § 1367. For the reasons that follow, Secor's Motion for Summary Judgment (docket #28) is GRANTED.

## **STANDARDS**

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id* at 324. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630-31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 US 574 (1986). The Ninth Circuit has stated, "No longer

can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id*.

## FACTS

On December 22, 2003, Fonseca started working at Secor's Portland office as an administrative assistant to Ross Simmons ("Simmons") and Randy Rees ("Rees"). She was an at-will employee.

### I.     Pornography

As part of her daily activities, Fonseca had to go into Simmons's office as often as four to five times a day to find, return and file papers and otherwise communicate with and take direction from Simmons. Typically Simmons kept his door open and did not expect anyone to knock before entering. He typically had his computer on during the day and his desk was situated so that a person looking into the office from the doorway or entering his office could see the screen on his computer monitor.

On January 14, 2004, another Secor employee, Paula Fitzgerald ("Fitzgerald"), who had been Simmons's Administrative Assistant prior to Fonseca, told Fonseca that she had seen pornography on Simmons's computer, had told him that she found it offensive, and refused to continue to use Simmons's workplace computer to read his e-mail messages. Two days later, Fonseca saw "an image of a naked woman moving for a few seconds" on Simmons's computer. Fonseca Aff, ¶ 8. Viewing the evidence in the light move favorable to Fonseca, thereafter she saw pornography on Simmon's computer "on almost a daily basis," "sometimes multiple times in a single day." *Id*, ¶¶ 8-9. She also would see Simmons "glued to his computer with a strange look on his face and his hand on his mouse," which she describes as a "look different from the

look he had when he was doing normal work." *Id*, ¶ 9. Simmons tried to minimize his computer screen or turn it away from Fonseca so that she would not see it. Because Simmons tried to hide the screen, Fonseca never saw any images for more than a few seconds.

On February 23, 2004, Fonseca informed Rees that she was noticing Simmons viewing pornographic material during business hours and complained that Simmons was not providing her with any work assignments. About two weeks later Rees advised her that he had spoken to the other women in the office and to Simmons. Simmons admitted that the pornographic images appeared on his computer through pop-ups, that he was having a difficult time removing them, and that he was embarrassed and apologized to anyone who had seen them. Rees told her that it would stop, but also told her that he had contacted Human Resources to discuss what to do about Fonseca compromising employee/supervisor confidentiality by sharing her information with her co-workers.

After her complaint to Rees, Fonseca continued to see pornographic images on Simmons's computer. She was offended by the pornography, feared to go into Simmons's office and suffered stress, anxiety, and related headaches.

Fonseca never spoke to Simmons about seeing pornographic images on his computer, never told him that it made her uncomfortable, and never took any steps to avoid surprising him in his office. Without asking for Simmons's permission, Fonseca snuck into his office when he was not there to see if he had pornography on his computer. Finding no pornographic images on his computer, she maximized his web browser and looked for a webcam address. Later, at her home, she visited the website she had found because she wanted to see it.

Aside from seeing Simmons viewing pornography, all of Fonseca's other contacts with Simmons were professional and she had no other complaints regarding his conduct. Simmons never tried to show Fonseca pornography, never made any sexual advances to her, never sent her graphic or sexual jokes or offensive or inappropriate e-mail messages, never made any comments she found offensive or upsetting, and never treated any of the women in the office in a less than professional way.

**II.     E-mail Messages**

Because Rees worked from home, during the six months Fonseca worked at Secor she saw Rees face to face only about 10 to 15 times. Weeks would go by when she would not see him at all. However, she received several e-mail messages from him each week.

Out of the many e-mail messages that Rees sent to Fonseca, three e-mail messages included the phrase "I think I love you." Fonseca was offended by that phrase and interpreted the messages to mean that Rees wanted to have a sexual relationship with her.

Each of the e-mail messages was sent in response to an e-mail message sent by Fonseca and referred to business matters. The first e-mail message, dated January 3, 2004, was in response to Fonseca's reminder that a conference call was cancelled to which Rees wrote: "I think I love you. . . It is so great to have you on board!!!!!!!!." McCloskey Dec, Ex B, p. 1. On January 25 ,2004, Fonseca sent a report and asked Rees to "take a peek – tell me if I am headed down the right track as to what type of info you are looking for in these reports." *Id* at 3. Rees responded: "You are not headed down the right path . . . you are showing me the path . . . I think I love you . . . . .THANKS." *Id*. The third e-mail message, dated April 5, 2004, said "I

THINK I LOVE YOU!!!!!!!! Stacy, this is GREAT!!!!" in response to Fonseca's inquiry whether she had provided a report to which he had referred. *Id* at 2.

Aside from these three e-mail messages, the communications between Rees and Fonseca were entirely professional. Rees never made any sexual comments to Fonseca, never sent her any sexually explicit material or off-color jokes, never asked her out on a date, never made sexual advances to her, never expressed an interest in having anything other than a professional relationship with her, never touched her in a way that made her uncomfortable, and never made inappropriate comments about other women in the office.

Fonseca did not speak to Rees regarding the e-mail messages or tell him that she was offended by them.

### III. Fonseca's Complaints

Fonseca sent a letter to Marguerite Shuffelton ("Shuffelton"), Vice President of Human Resources, on April 7, 2004, informing her of "ongoing inappropriate behavior" by Simmons "that could be classified as sexual harassment." Plaintiff's Ex 13. She also attached copies of the three e-mail messages from Rees that she felt were offensive. However, at that time, Shuffelton was out of work with pneumonia and remained ill with related complications until she returned to work approximately a month later.

Having received no response to her April 7, 2004 letter, Fonseca contacted an attorney, who then sent a letter on May 26, 2004, stating that Fonseca was "unable to continue to work in this environment" and that she was "willing to resign her position with Secor and seek other employment if an adequate severance package can be negotiated." Plaintiff's Ex 14.

Shuffelton met with Fonseca twice in June to discuss her complaints. At the initial meeting, Fonseca complained to Shuffelton that she did not have enough work to do, and that she felt ignored by Simmons and Rees. Shuffelton then spoke with Simmons, Rees, and other employees in the office who worked with them, regarding Fonseca's complaints. During those interviews, several female Secor employees stated that they had seen pornographic materials on Simmon's computer. Rebecca Thomas, a receptionist, told Shuffelton that for a "split second" she had seen a "lady in a red dress" on his computer, but she could not tell if it was a screensaver or a movie. Steenson Aff, Ex 16 (SEC 0312). Tamara Palm reported that she once something on Simmon's computer that looked like a "pop up with women's breasts showing," but that Simmons "immediately minimized the screen." *Id*, Ex 16 (SEC 0314). After that, Palm only saw work-related materials on his computer screen. Fitzgerald reported that, one time, when Simmons was out of town, she opened Simmon's e-mail messages and came across a "porn 'pop up.'" *Id*, Ex 16 (SEC 0317). Fitzgerald told Simmons she no longer wanted to open his e-mail messages and never saw pornography again on his computer.

Shuffelton then met with Fonseca again and asked her whether she could continue to work with Simmons and Rees.[1] Fonseca told Shuffelton at a minimum that she would find it difficult to work with them. She did not offer Shuffelton any alternatives that would satisfy her or identify any circumstances under which she would continue in her current position. Short of firing both Simmons and Rees, or finding a different position for her in another department, there

---

[1] Although Shuffelton recalls asking Fonseca whether she could continue to work with Simmons if Secor worked with him to correct his conduct (Shuffelton Dec. ¶ 7), Fonseca claims that she was given no assurances that Secor would do anything to stop the behavior. Fonseca Depo, pp. 187-88.

is nothing Secor could have done which would have made Fonseca comfortable continuing to work with the company.

At the time, there were no other positions in Secor's Portland office for which Fonseca was qualified.

## DISCUSSION

### I. Hostile Work Environment

#### A. Legal Standards

Sexual harassment in the form of a hostile work environment constitutes unlawful discrimination. *Vasquez v. County of Los Angeles,* 349 F3d 634, 642 (9th Cir 2003). In order to establish a claim based on a hostile work environment theory, Fonseca must show that: (1) she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) that this conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Id.*

The plaintiff must also prove that his or her workplace was both objectively and subjectively offensive and hostile. *Harris v. Forklift Sys., Inc.,* 510 US 17, 23 (1993). In this case, the objective severity of harassment is evaluated from the perspective of a reasonable woman. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 US 75, 79 (1998); *Harris,* 510 US at 23.

To determine if a work environment is sufficiently offensive or hostile, the court looks at all the circumstances, including the frequency of the discriminatory conduct, its severity, and whether it unreasonably interfered with the plaintiff's work environment. *Texas Dep't of Comm.*

*Affairs v. Burdine*, 450 US 248, 253 (1981). The requisite level of severity "varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady,* 924 F2d 872, 878 (9th Cir 1991). "It is the harasser's conduct which must be pervasive or severe, not the alteration in the conditions of employment." *Id.* While occasional "annoying" or "merely offensive" comments do not constitute sexual harassment, sexual-based conduct that is abusive, humiliating, or threatening is sufficient. *Steiner v. Showboat Operating Co.,* 25 F3d 1459, 1463 (9th Cir 1994), citing *Harris,* 510 US at 21-22. "It is enough, rather, if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Id.*

**B. Analysis**

Taken in the light most favorable to Fonseca, the record reveals that: (1) Simmons routinely viewed pornographic materials and watched pornographic webcam broadcasts in his office that Fonseca unavoidably saw for a few seconds several times a day when she entered his office to perform her work duties; and (2) Rees sent Fonseca three e-mail messages which incorporated the phrase "I think I love you." This court concludes that this evidence is insufficient as a matter of law to support a claim for a hostile work environment.

The first requirement of an hostile work environment claim is that the plaintiff establish she was subjected to a specific kind of conduct, namely verbal or physical conduct of a sexual nature. This requirement incorporates two important characteristics. First, the "subjected to" prong clearly indicates that the alleged harasser must actively direct his conduct at the plaintiff. Second, the conduct must be both "verbal or physical" and "of a sexual nature."

There is no dispute that Simmons's computer was used to view materials that were "of a sexual nature," although the precise content of those materials is unclear. Fonseca has submitted an exhibit (Plaintiff's Ex 9) which itemizes some of the materials that were stored on Simmons's computer, many of which display hard-core pornographic images. However, there is no evidence that Fonseca viewed any of the images contained in that exhibit. The images were not retrieved from Simmons's computer until over a week after Fonseca no longer worked at Secor, and the record does not reveal when or how the images became saved in Simmons's computer. Moreover, Fonseca's descriptions of the images she saw are either generic ("pornography") or describe fleeting glimpses of "a naked woman moving," "nudity" or "naked people." Fonseca Aff, ¶ 8. Although the severity of the images in Plaintiff's Exhibit 9 are largely irrelevant, this evidence supports the inference that the materials seen by Fonseca were pornographic.

In any event, the only "conduct" allegedly engaged in by Simmons was viewing those images on his work computer while alone in his office. No evidence indicates that Simmons actively directed the images or webcam broadcasts at Fonseca. He never asked Fonseca to view the images or webcam broadcasts. To the contrary, although he was not entirely successful in doing so, it is undisputed that Simmons attempted to keep the pornography he was viewing private from both men and women.

Although Simmons's computer screen faced an open door, Fonseca admits that when she walked into his office, Simmons tried to minimize his computer screen or turn it away from her so that she would not see it. Fonseca herself characterizes Simmons's behavior of looking at pornographic web sites not as something he "subjected" her to, but something she periodically "caught" him doing. Fonseca Aff, ¶ 8. She also notes that, at least on February 17, 2004,

Simmons "acted like he was doing nothing wrong" when he was viewing a pornographic web site. *Id*.

Fonseca's predecessor, Fitzgerald, refused to read Simmons's e-mail messages after inadvertently encountering an objectionable pop-up on his computer. Nothing in the record suggests that Fitzgerald faced any adverse employment action as a result of her refusal to look at Simmons's computer screen. Rather than taking that course, Fonseca surreptitiously opened Simmons's computer screen and accessed his internet page in order to "clarify" what it was she thought she saw Simmons viewing on his computer. Fonseca never told Simmons she found his conduct offensive, nor did she avert her eyes or knock when entering his office to announce her presence. Fonseca's conduct evinces more of a prosecutorial intent rather than that of a victim.

Simmons never made any sexual advances toward Fonseca; he never sent her any sexual or graphic or otherwise inappropriate or offensive jokes or e-mail messages; he never asked her out on a date or made any advances toward her; and he never made any comments to her that she found upsetting or offensive. Nor did he leave pornographic materials displayed on his computer when he was out of the office. His public behavior was professional and appropriate to Fonseca and the other women in the office.

Certainly, a successful hostile work environment claim may be bolstered by the presence of pornographic materials on display in the workplace, especially when those materials are targeted at the plaintiff or unapologetically on display in public work areas. *See, e.g., O'Rourke v. City of Providence*, 235 F3d 713 (1st Cir 2001); *Splunge v. Shoney's, Inc.*, 97 F3d 488 (11th Cir 1996). Moreover, Secor may well be justified in taking disciplinary action against employees who use work time and work computers to view or save such materials. However, the issue in

11 - OPINION AND ORDER

this case is whether the private viewing of pornographic materials by a supervisor in his office on his computer, which he immediately hides when "caught" viewing them, provides a basis for a hostile work environment claim. A hostile work environment requires more evidence that simply violating company policy.

This court is not aware of any case in which a hostile work environment claim survived summary judgment based exclusively on allegations that an employee inadvertently viewed pornographic materials in the possession of his or her supervisor while the employee was in his or her supervisor's office to carry out work duties. If sporadic use of abusive language, gender-related jokes, and occasional teasing does not suffice to create a hostile work environment, then Fonseca's fleeting exposures to pornography which Simmons tried to hide from everyone, coupled with the lack of any verbal or physical conduct, cannot do so.

Similarly, the only conduct by Rees which Fonseca offers in support of her hostile work environment claim is his using the phrase "I think I love you" in three e-mails. These e-mails cannot be viewed as an attempt to ridicule, intimidate or insult Fonseca. When taken in their business context, no reasonable woman would interpret Rees's use of the phrase "I think I love you" as having any sexual connotation. Instead, it is clear that Rees was attempting to compliment (perhaps clumsily) Fonseca on her job performance.

The e-mail messages were not accompanied by any inappropriate conduct. Rees never made any sexual comments to Fonseca; he never shared any sexually explicit cartoons or jokes; he never asked her out on a date or made any sexual advances toward her; he never touched her in a way that made her feel uncomfortable; he never made comments about other women in the

office that she regarded as offensive or inappropriate. In fact, Rees hardly saw Fonseca – their communication was largely by telephone and e-mail.

Accordingly, Fonseca's claim alleging a hostile work environment is without merit.

## II. Retaliation and Wrongful Termination

Fonseca also alleges a retaliation claim under both Title VII and ORS Chapter 659A, as well as a wrongful discharge claim under Oregon law. All of these claims are premised on the allegation that Secor terminated Fonseca in retaliation for complaining about a hostile work environment.

### A. Legal Standards

It is unlawful to retaliate against an employee because she has taken action to oppose discriminatory employment practices. To establish a *prima facie* case of discriminatory retaliation, Fonseca must show that: (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. *Brooks v. City of San Mateo*, 229 F3d 917, 928 (9th Cir 2000); *Harris v. Pameco Corp.*, 170 Or App 164, 178-79, 12 P3d 524, 533 (2000).

Assuming a plaintiff establishes that she engaged in protected activity and suffered an adverse action, the plaintiff then must establish a causal link between those two elements. To show the requisite causal link under Title VII, plaintiffs must "present evidence to raise the inference that [the] protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F2d 793, 796 (9th Cir 1982) (citations omitted). In the Ninth Circuit, "[c]ausation sufficient to establish a *prima facie* case of unlawful retaliation may be inferred

from the proximity in time between the protected action and the allegedly retaliatory discharge." *Miller v. Fairchild Indus., Inc.* 797 F2d 727, 731 (9th Cir 1986), *aff'd in part, rev'd in part on other grounds*, 885 F2d 498 (1989) (*en banc*), *cert denied*, 494 US 1056 (1990) (citations omitted).

Oregon uses a "'substantial factor' test to determine whether the plaintiff's protected activities were the cause of defendant's adverse actions." *Seitz v. Albina Human Res. Ctr.*, 100 Or App 665, 675, 788 P2d 1004, 1010 (1990), citing *Holien v. Sears Roebuck & Co.*, 298 Or 76, 90 n5, 689 P2d 1292, 1299-1300 n5 (1984). "[T]o be a substantial factor, the employer's wrongful purpose must have been 'a factor that made a difference'" in the decision to take the adverse action. *Estes v. Lewis and Clark Coll.*, 152 Or App 372, 381, 954 P2d 792, 796, *rev denied*, 327 Or 583, 971 P2d 411 (1998), quoting *Nelson v. Emerald People's Util. Dist.*, 116 Or App 366, 373, 840 P2d 1384, 1390 (1992), *aff'd in part, rev'd in part*, 318 Or 99, 862 P2d 1293 (1993).

### B. Analysis

To prove her claim that she was terminated in retaliation for complaining about the conduct of Simmons and Rees, Fonseca relies on the facts that she was verbally reprimanded by Rees for talking about Simmons's conduct to her co-workers, that her first complaint in April 2004 to Shuffelton was ignored, that Shuffelton's investigation focused on her attitude, and that she was given no assurance that Simmons's behavior would be curtailed, culminating in her termination in June 2004. Secor responds that the causal link between her complaints and her termination is missing.

///

///

As of the time of Secor's investigation into Simmons's computer activities, Fonseca's attorney had already written a letter stating that Fonseca was "unable to continue to work in this environment" and stating that she was "willing to resign her position with Secor and seek other employment if an adequate severance package can be negotiated." Plaintiff's Ex 14. Two weeks later, Fonseca told Shuffelton that she would "find it difficult" to work with Simmons and Rees. Fonseca Depo, pp. 189. After that, Sheffelton "basically [told Fonseca to] gather up [her] stuff and go." *Id* at 190. Fonseca contends that Sheffleton never told her that Secor was committed to taking steps to ensure that Simmons ceased viewing pornography on his computer and Rees ceased his inappropriate conduct, and that, had she received those assurances, she would gladly have stayed. Fonseca Aff, ¶ 22.[2]

However, that assertion contradicts her deposition testimony that there was nothing short of a transfer to another department (which she admits was not available at that time) or Simmons and Rees being fired that would have made it possible for her to continue working at Secor. Furthermore, Fonseca had at least some assurance that Secor was acting to prevent what she perceived to be harassment given that her first complaint regarding Rees's e-mail messages (the April 7, 2004 letter) did stop the allegedly offensive behavior.

In effect, Fonseca presented Secor with an ultimatum, namely to fire Simmons and Rees or she would resign. Secor cannot be held liable for failing to capitulate by firing Simmons and Rees, which it had no legal duty to do. *Swenson v. Potter*, 271 F3d 1184, 1196 (9th Cir 2001)

---

[2] Fonseca also states that Secor had other employment available (Fonseca Aff, ¶ 23), but that statement contradicts her admission of defendant's Concise Statement of Material Facts and is not based on personal knowledge.

("As a matter of policy, it makes no sense to tell employers that they act at their legal peril if they fail to impose discipline even if they do not find what they consider to be sufficient evidence of harassment."). Had Fonseca not given such an ultimatum and Secor had simply fired her after she complained, then a reasonable person could infer a retaliatory motive by Secor. However, Fonseca's intervening act of refusing to work with Rees and Simmons cuts off the causal connection between her protected activity of complaining about Simmons and Rees and her termination.

Perhaps Shuffelton could have better handled the last meeting with Fonseca by asking why it would be difficult for Fonseca to work with Simmons and Rees or by making it clear that if Fonseca stayed, disciplinary action would be taken against Simmons. However, Shuffelton was faced with the letter from Fonseca's attorney, Fonseca's statement that she would find it difficult to work with Simmons and Rees, and the lack of an alternative job. As a result, she had no choice. Fonseca's termination was due not to any retaliatory motivation for engaging in protected activity, but rather to her refusal to continue to work in the only job which was available.

Accordingly, Fonseca's retaliation and wrongful discharge claims must be dismissed.

## ORDER

For the reasons stated above, Secor's Motion for Summary Judgment (docket #28) is GRANTED.

DATED this 5th day of May, 2005.

_/s/ Janice M. Stewart _____
Janice M. Stewart
United States Magistrate Judge

("As a matter of policy, it makes no sense to tell employers that they act at their legal peril if they fail to impose discipline even if they do not find what they consider to be sufficient evidence of harassment."). Had Fonseca not given such an ultimatum and Secor had simply fired her after she complained, then a reasonable person could infer a retaliatory motive by Secor. However, Fonseca's intervening act of refusing to work with Rees and Simmons cuts off the causal connection between her protected activity of complaining about Simmons and Rees and her termination.

Perhaps Shuffelton could have better handled the last meeting with Fonseca by asking why it would be difficult for Fonseca to work with Simmons and Rees or by making it clear that if Fonseca stayed, disciplinary action would be taken against Simmons. However, Shuffelton was faced with the letter from Fonseca's attorney, Fonseca's statement that she would find it difficult to work with Simmons and Rees, and the lack of an alternative job. As a result, she had no choice. Fonseca's termination was due not to any retaliatory motivation for engaging in protected activity, but rather to her refusal to continue to work in the only job which was available.

Accordingly, Fonseca's retaliation and wrongful discharge claims must be dismissed.

## ORDER

For the reasons stated above, Secor's Motion for Summary Judgment (docket #28) is GRANTED.

DATED this 5th day of May, 2005.

_/s/ Janice M. Stewart _____
Janice M. Stewart
United States Magistrate Judge